AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Artus Johnson, a.k.a. "Tru" | ) | 24-mj-7011 (EAP) |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ See Attachment A _____ in the county of _____ Burlington _____ in the

_____ District of _____ New Jersey _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 | Conspiracy to distribute cocaine |

This criminal complaint is based on these facts:

See Attachment B.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Anthony Dipietro, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 02/27/2024 _____

_____
*Judge's signature*

City and state: _____ Camden, New Jersey _____    Hon. Elizabeth A. Pascal, USMJ
*Printed name and title*

## ATTACHMENT A

### COUNT ONE

<u>Conspiracy to Distribute and Possess with Intent to Distribute Cocaine</u>

Between on or about January 3, 2024, to on or about February 27, 2024, in Burlington County, in the District of New Jersey, and elsewhere, the defendant,

### ARTUS JOHNSON,

did knowingly and intentionally conspire and agree with others to distribute and possess with intent to distribute a substance or mixture containing a detectable amount cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1) and (b)(1)(C).

All in violation of Title 21, United States Code, Section 846.

**ATTACHMENT B**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

1.     I, Anthony Dipietro, am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2010.  I have been involved personally in the investigation of this matter.  The information contained in this complaint is based on my personal knowledge and on information obtained from other sources, including: (i) statements made or reported by various witnesses with knowledge of relevant facts; (ii) my review of documents and evidence obtained through court orders, subpoenas, and other sources; (iii) assistance provided to law enforcement by multiple confidential sources of information deemed credible and reliable; and (iv) my review of wire and electronic communications intercepted pursuant to court-authorized wiretaps. Because this complaint is submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in sum and substance and in part, and the statements set forth herein are based on preliminary summaries and transcriptions of those communications. Where I assert that an event occurred on a particular date, I am asserting the event occurred on or about the date alleged.

2.     This Affidavit is submitted in support of criminal complaints and arrest warrants for the following individuals and charges:

   a.  MANSFIELD JOHNSON, a.k.a "Money Mike"

      i.  Conspiracy to distribute and possess with intent to distribute over 40g of fentanyl, contrary to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi), in violation of 21 U.S.C. § 846;

      ii.  Possession of a firearm by a convicted felon, 18 U.S.C. § 922(g); and

     iii.  Conspiracy to traffic in firearms, 18 U.S.C. §§ 933(a)(2) and (3).

   b.  ARTUS JOHNSON,[1] a.k.a. "Tru"

      i.  Conspiracy to distribute and possess with intent to distribute cocaine, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), in violation of 21 U.S.C. § 846.

   c.  MICHAEL MCCRAY, a.k.a. "Gutter"

      i.  Conspiracy to distribute and possess with intent to distribute over 40g of fentanyl, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), in violation of 21 U.S.C. § 846.

---

[1] This matter involves multiple subjects with the surname Johnson. References to MANSFIELD JOHNSON will generally be shortened to simply "JOHNSON." References to individuals other than MANSFIELD JOHNSON with the surname Johnson will use their full name.

    d.  SHAMEKE FOWLER, a.k.a. "Murder"

        i.  Conspiracy to traffic in firearms, 18 U.S.C. §§ 933(a)(2) and (3).

    e.  EDDIE HUTCHINSON, a.k.a. "Bang"

        i.  Conspiracy to distribute cocaine, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), in violation of 21 U.S.C. § 846.

    f.  MELODY STRATTON

        i.  Conspiracy to distribute and possess with intent to distribute fentanyl, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), in violation of 21 U.S.C. § 846; and

        ii.  Conspiracy to traffic in firearms, 18 U.S.C. §§ 933(a)(2) and (3).

    g.  ALTERIC HINES

        i.  Conspiracy to traffic in firearms, 18 U.S.C. §§ 933(a)(2) and (3).

    h.  JAMAL PHILLIPS, a.k.a. "Naz"

        i.  Conspiracy to distribute and possess with intent to distribute cocaine, contrary to 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), in violation of 21 U.S.C. § 846.

3.      The FBI has been investigating JOHNSON and his drug distribution activity since February 2023. From August 24, 2023, through February 21, 2024, two undercover law enforcement officers ("UC-1" and "UC-2") collectively made 11

purchases of controlled substances, and one purchase of a firearm, from JOHNSON

and his coconspirators. The following chart summarizes the undercover purchases.

| Date | Purchaser | Items Purchased | Field Test and Lab Results |
|---|---|---|---|
| 8/24/2023 | UC-1 | 24 bricks of heroin/fentanyl | Positive lab test for heroin and fentanyl – 28g |
| 9/13/2023 | UC-1 and UC-2 | 50 bricks of heroin/fentanyl | Positive lab test for fentanyl – 50g |
| 9/27/2023 | UC-1 | 50 bricks of suspected heroin/fentanyl | Positive lab test for fentanyl – 60g |
| 10/18/2023 | UC-1 | 36 bricks and loose powder heroin/fentanyl | Positive lab test for fentanyl; 52.9g |
| 11/15/2023 | UC-1 and UC-2 | Loose powder heroin/fentanyl and crack cocaine | Positive lab test for fentanyl – 53.8g; Positive lab test for cocaine base – 27.8g |
| 12/5/2023 | UC-1 | Loose powder heroin/fentanyl and powder cocaine | Positive lab test for fentanyl – 49.17g; positive lab test for cocaine – 27.48g |
| 1/11/2024 | UC-2 | Powder cocaine | Positive TruNarc test for cocaine |
| 1/16/2024 | UC-2 | Powder and crack cocaine; one firearm | Positive lab test for cocaine base – 20.7g; Positive lab test for cocaine – 6.8g |
| 1/19/2024 | UC-1 | Loose powder heroin/fentanyl and powder cocaine | Positive lab test for cocaine – 53.9g; positive test for fentanyl – 95.1g |
| 2/6/2024 | UC-1 | Loose powdered heroin/fentanyl | Positive lab test for fentanyl – 99.8g |

| Date | Purchaser | Items Purchased | Field Test and Lab Results |
|------|-----------|-----------------|----------------------------|
| 2/21/2024 | UC-2 | Powder cocaine | Positive TruNarc test for cocaine; lab results pending |

4.      On September 27, 2023, law enforcement officers met to conduct an undercover purchase of heroin from JOHNSON. On September 27, 2023, JOHNSON and UC-1 both talked and texted over JOHNSON's cellphone to confirm the amount of heroin and the price, 50 bricks for $4,500, and the meeting location, a supermarket parking lot in Willingboro, NJ. UC-1 drove to the supermarket parking lot to wait for JOHNSON to arrive. Shortly thereafter, surveillance officers observed a black Honda Civic enter the supermarket parking lot. SUBJECT-1 was driving and JOHNSON was in the front passenger seat. SUBJECT-1 parked the Honda, then exited the vehicle and took a dog that was also in the vehicle for a walk around the parking lot. JOHNSON remained in the black Honda. A few minutes later, UC-1 received a telephone call from JOHNSON. JOHNSON told UC-1 that he was concerned about two vehicles in the parking lot, stating that there were "two plain clothes cops over there," and that they should change the meeting location. UC-1 and JOHNSON agreed to move the meeting location to the parking lot of a convenience store in Burlington Township, NJ. UC-1 then drove to the new meeting location, while still talking to JOHNSON on the phone. Once SUBJECT-1 reentered the Honda, they and JOHNSON also drove to the new meeting location. After both vehicles were parked, JOHNSON exited the Honda and entered UC-1's vehicle. For

approximately the next 45 minutes, JOHNSON and UC-1 sat in UC-1's vehicle and made small talk about selling drugs. Next, a white Kia Soul was observed entering the convenience store parking lot. The Kia was being driven by an unidentified female with MCCRAY in the front passenger seat. As the Kia was arriving, JOHNSON received a call on his cellphone. UC-1 overheard the other individual tell JOHNSON that he had arrived. After the female parked the Kia, MCCRAY then entered UC-1's vehicle while carrying two shopping bags. Once inside UC-1's vehicle, MCCRAY handed one of the bags to UC-1. UC-1 then saw that there was a vacuum sealed package inside the bag, containing the 50 bricks of heroin that they had ordered from JOHNSON. UC-1 then handed the $4,500 cash to JOHNSON. MCCRAY and JOHNSON then both exited UC-1's vehicle. UC-1 drove away from the area while JOHNSON and MCCRAY entered the convenience store together. The suspected heroin was later sent to a DEA laboratory for testing, where it tested positive for fentanyl. The substance weighed 60 grams.

5.     On December 5, 2023, law enforcement officers met to conduct an undercover purchase of controlled substances from JOHNSON. Prior to this day, UC-1 had contacted JOHNSON on his cellphone to order 50 grams of loose heroin/fentanyl and one ounce of powder cocaine. UC-1 travelled to the previously agreed upon meeting location, a convenience store parking lot in Burlington, NJ. When he arrived, he parked his vehicle and began waiting for JOHNSON to arrive. About 15 minutes later, a black Toyota Camry, driven by STRATTON with JOHNSON in the front passenger seat, pulled into the convenience store parking lot

6

and parked on the opposite side of the lot. STRATTON then exited the Toyota, walked to UC-1's vehicle, and entered the front passenger seat. STRATTON then delivered the drugs UC-1 had ordered from JOHNSON. UC-1 paid STRATTON for the drugs, then she exited the car and walked back across the lot to the black Toyota Camry. UC-1 then looked at his cellphone and saw that he had received a text message from JOHNSON that stated, "my ppls walkin it to u." UC-1 then drove away from the area. The suspected heroin/fentanyl was later transported to the Burlington County Forensic Science Laboratory, where it tested positive for fentanyl. The substance weighed 49.17 grams. The suspected cocaine was later transported to a DEA laboratory, where it tested positive for cocaine. The cocaine weighed 27.48 grams.

6.    On January 13, 2024, at approximately 2:59 p.m., FBI agents intercepted an incoming telephone call to JOHNSON's cellphone from ALTERIC HINES. A portion of the call was transcribed as follows:

HINES: Na, already no. Spread the word, fool. Tryna grab, uh, grab uh a 40. See if someone trying to grab a 40. It's clean.

JOHNSON: Oh my god. One my peoples came to me yesterday tryna grab something, man.

HINES: Hit them up. Tell them I got a 40. I want [UI][2]

JOHNSON: Think I could sell to him now. He sent a lady yesterday. Me and her took a ride together. I don't think they the police, though. I still

---

[2] Unintelligible.

ain't want to involve guns with that dude. But the ride I took with her

yesterday, I don't think they were the boys.

HINES: Chop it up with them. See if they tryna grab it. Tell them to give me

800, with the license, brand new.

JOHNSON: 800?

HINES: Yeah.

JOHNSON: [UI] real quick.

HINES: Alright, let me know.

Based on my training and experience, I believe that HINES was telling JOHNSON

that he had a .40 caliber handgun for sale during this conversation. I know that gun

traffickers will often use cryptic language to discuss the illegal transfer of firearms

on the phone. They do this guard against law enforcement interception of their

telephone calls. I also know that "40" is common slang for a .40 caliber firearm. I

also know that when a gun trafficker refers to a gun as being "clean," they are

indicating that the firearm has not been connected to a shooting or other criminal

activity. Thus, when HINES told JOHNSON, "See if someone tryna to grab a 40.

It's clean," he was telling JOHNSON that he had a "clean" .40 caliber firearm for

sale. JOHNSON responded, "Oh my god. One my peoples came to me yesterday

tryna grab something, man." Based on this investigation, I believe this was a

reference to prior conversations that JOHNSON had with the undercover officers,

during which UC-1 had expressed a desire to purchase a firearm from JOHNSON.

This belief was confirmed when JOHNSON further stated, "Think I could sell to

him now. He sent a lady yesterday. Me and her took a ride together." I believe this was a reference to the undercover purchase of suspected cocaine that UC-2, who is a woman, made from JOHNSON on January 11, 2024. HINES and JOHNSON concluded the call by confirming that HINES would sell the firearm for $800.

7.      After the intercepted call between HINES and JOHNSON, but prior to the events described below, JOHNSON had agreed to sell UC-2 a quantity of cocaine and a handgun. JOHNSON had set the price of the handgun at $1,000. On January 16, 2024, at approximately 1:59 p.m., FBI agents intercepted an incoming call to JOHNSON's cellphone from SHAMEKE FOWLER. During the call, JOHNSON said, "I need you to do me a favor right. I need you to do me a solid." FOWLER replied, "I'm listening." JOHNSON then said, "Pick ole girl up from Front Street and meet me at the Wawa on Sunset because I need her to go, I need, that will save me a trip from coming out there." Based on my training and experience, I believe that JOHNSON was asking FOWLER to pickup STRATTON ("ole girl") from STRATTON's residence ("Front Street") in Mount Holly, NJ. Later on, JOHNSON explained, "definitely need you to get her though because I got somebody waiting for me and this going to save me a trip. The person I got waiting for me they been sitting there for a minute. I don't want to go all the way to Mt. Holly and then got to come there and meet her. I really got to go get something from her so." Based on my training and experience, I believe that JOHNSON was explaining that "the person I got waiting for me," meaning UC-2, "been sitting there for a minute," meaning waiting a long time. JOHNSON then emphasized that, "I

really got to get something to her." Based on my training and experience, I believe that JOHNSON was referring to the handgun that he had agreed to sell to UC-2 which I believe was being held by STRATTON at STRATTON's residence. FOWLER agreed to do as JOHNSON had asked.

8.    At approximately 2:03 p.m., FBI agents intercepted an outgoing call from JOHNSON's cellphone to STRATTON's cellphone. The conversation between JOHNSON and STRATTON was transcribed as follows:

JOHNSON: Hey, you do me a solid?

STRATTON: [UI]

JOHNSON: Can you ahh, can you bring that to me? Meet me at the Wawa? On Sunset?

STRATTON: How am I get it to you?

JOHNSON:  I gonna, I'm ready to come get you. Be there in like, be there in like 10, 15 minutes. I bring you, I bring you right back.

STRATTON: (yells to get off the TV)

JOHNSON: I got this lady out here waiting and shit, because I'm gonna have to go way over there then come back. She waiting. She been waiting all that. [UI]. I'm about go to her right now. The all, bout to. [UI] I need you to bring that jawn up.

STRATTON: Alright.

JOHNSON: Shit, I'm thinking about just coming [UI]. Oh my God.

Based on my training and experience and what I have learned from the investigation thus far, I believe that when JOHNSON asked STRATTON to "bring that to me," "bring that jawn up," he was asking STRATTON to bring him a firearm

that she was safeguarding for him, so that JOHNSON could sell the firearm to UC-2. I am aware that criminals frequently attempt to shield themselves from law enforcement detection and prosecution by speaking in code on the telephone. I also know that criminals frequently refer to firearms as a "thing" or as a "jawn," to shield themselves from law enforcement detection and prosecution. Shortly before this call, JOHNSON had arranged to sell a firearm to UC-2, a female undercover officer. When JOHNSON said, "I got this lady out here waiting and shit," I believe he was referring to UC-2, because JOHNSON was late for the pre-arranged sale of the firearm to UC-2.

 9. At approximately 2:05 p.m., FBI agents intercepted another call between JOHNSON and FOWLER. The conversation was transcribed as follows:

 FOWLER: Yea. [UI]. I mean yeah, I'm not, but the [UI] car.

 JOHNSON: Who drivin?

 FOWLER: Who you think nigga?

 JOHNSON: You won't be drivin?

 FOWLER: Yea.

 JOHNSON: I can't risk all this situation.

 FOWLER: Oh, it's a delicate joint?

 JOHNSON: She got the hammer and shit. I need her to bring the hammer. I ain't gonna, trying to cause shit, you know what I mean? It ain't a 100 percent legit.

FOWLER: Umm, man I wish I knew. Matter of fact, he gotta let her drive. She got a license. I just saying, my girl is not gonna like that.

JOHNSON: [UI] I need her to bring a hammer and shit, you know what I'm saying? Talking reckless bullshit. I got this motherfucker waiting. I ain't trying to lose out on this shit, cause they gonna fucking, feel me, they gonna fucking slide, man. [UI] hurry up.

FOWLER: Alright, well ahh, fucking (unidentified female in background)

UNIDENTIFIED FEMALE: I'm white.

FOWLER: Hey, yo. Look, I'll let my sister drive. She's fucking white. The car's legit. How you feel about that? If not, I'll take whatever.

JOHNSON: That's good, that's good, that's good money. You sliding out right now though?

FOWLER: Yea, but I told, I'm gonna be to her in 5 to 6 minutes.

JOHNSON: Alright.

FOWLER: She lives [UI] right around da corner.

JOHNSON: I know. I'm on the road already. I'm in Burlington now.

FOWLER: I'm on my way now. I got you.

JOHNSON: Alright.

Based on my training and experience, I believe that in this call JOHNSON was telling FOWLER that STRATTON was bringing a gun to sell to the person who was waiting. I know from my training and experience that "hammer" is common slang for a firearm, particularly a handgun. Thus, when JOHNSON stated, "She got the

hammer," and "I need her to bring the hammer," he was telling FOWLER that he needed STRATTON to bring the handgun to the sale. JOHNSON and FOWLER then discussed who would drive and what car FOWLER would use to bring STRATTON to the meetup. Based on my training and experience, I know that drug dealers and gun traffickers will often employ drivers who the police might not think to be involved in criminal activity. They often use women to fill this role. Thus, when FOWLER stated, "Look, I'll let my sister drive. She's fucking white. The car's legit," he was informing JOHNSON that the unidentified white female would drive and that the car was properly registered and insured, that is, "legit."

10.    At approximately 2:00 p.m., JOHNSON was observed leaving his residence in Florence. At approximately 2:01 p.m., JOHNSON entered a black Toyota Camry and drove out of his apartment complex. He drove to a pharmacy in Burlington, where he met with SUBJECT-2. JOHNSON then drove the Toyota to the meeting location with UC-2, a convenience store parking lot. JOHNSON arrived at approximately 2:19 p.m. and parked next to UC-2's vehicle. He then instructed UC-2 to meet him in the parking lot of a nearby McDonald's. At that time, UC-2 saw that another man, later identified as HINES, in the front passenger seat of the JOHNSON's vehicle. At approximately 2:23 p.m., surveillance officers observed FOWLER pick up STRATTON from STRATTON's residence in a black Kia sedan. At approximately 2:30 p.m., both JOHNSON and UC-2 parked their respective cars in the McDonald's parking lot. JOHNSON then exited his car and entered UC-2's car. HINES also exited JOHNSON's car and stood outside the cars, apparently

acting as a lookout while JOHNSON completed the sales. JOHNSON then sold a quantity of powder cocaine and crack cocaine to UC-2. At approximately 2:44 p.m., FOWLER and STRATTON arrived in the black Kia. Thereafter, STRATTON exited the Kia and entered UC-2's car. While all three of them sat inside the undercover vehicle, STRATTON handed a red bag to JOHNSON. JOHNSON then removed a handgun from the red bag, wiped the handgun and the magazine clean with his shirt, and then sold the firearm and magazine to UC-2. JOHNSON and STRATTON then exited the car and UC-2 drove away from the area. The cocaine was field tested with a TruNarc device, returning a positive result for cocaine. The firearm was a Smith & Wesson, model SW40VE, .40S&W caliber pistol with serial number PDC1344. The slide of the firearm is stamped "Springfield, MA USA." Based on the foregoing, I believe that HINES supplied the .40 caliber handgun to JOHNSON for $800, that STRATTON and FOWLER knowingly transported the handgun to the meeting location, and that JOHNSON finalized the sale of the handgun to UC-2 for $1,000.

11.     Additionally, based on my consultation with law enforcement colleagues at the ATF, I have learned that firearm JOHNSON sold the UC-2 was manufactured outside of New Jersey. I also know that it is a felony under New Jersey law to transfer a handgun to another person without having obtained a permit to do so. *See* N.J. Stat. § 2C:39-10. JOHNSON is also prohibited from possessing a firearm due to a February 17, 2021, felony conviction in New Jersey

14

Superior Court for distribution of a controlled substance. JOHNSON was sentenced to three years imprisonment for that offense.

12.    During the course of the court-authorized interception of JOHNSON's cellphone, which began on January 3, 2024, and is ongoing, FBI agents intercepted numerous communications that indicated ARTUS JOHNSON had conspired with JOHNSON to distribute controlled substances. Below are several examples of intercepted communications that demonstrate the existence of this conspiracy:

a.    On February 5, 2024, at approximately 11:34 a.m., FBI agents intercepted a telephone call between JOHNSON and SUBJECT-3. During the conversation, JOHNSON stated, "I just grabbed 30 like 6 in the morning from my brother bitch, I'm trying to move that shit, man, so I can grab that shit from my folks so I can catch my, you know what I mean, my big situation. I need that." Based on this investigation and my training and experience, I believe that JOHNSON's reference to "just grabbed 30...from my brother," was a reference to receiving 30 grams of cocaine from ARTUS JOHNSON, JOHNSON's brother. Further, when JOHNSON stated, "I'm trying to move that shit...so I can catch...my big situation," I believe he was telling SUBJECT-3 that he needed to sell the 30 grams of cocaine so that he would have the money necessary to complete his next drug deal, that is, "my big situation."

b.    On February 9, 2024, at approximately 5:44 p.m., FBI agents intercepted an incoming telephone call to JOHNSON's cellphone from ARTUS JOHNSON. The pertinent part of the call was transcribed as follows:

MJ: Yo, you hear me? You at the crib?

AJ: About to be there in two minutes.

MJ: You send the hard body out?

AJ: I'm here to get two.

MJ: Man, you can leave it. I'll give it to you in a little bit.

AJ: You ain't got two-thirds?

MJ: Not on me.

AJ: They told me 10 at first.

MJ: Unless somebody went to grab it. They ain't grab me any more though. I'm waiting for my young boys to come pay [UI] owe me. I gave my money to uh, I'm waiting for my shit to land as soon as they come to town and shit.

Based on this investigation, I believe that this conversation was about crack cocaine. I know that "hard body" is common street slang for crack cocaine. Thus, when JOHNSON asked, "You send the hard body out?" he was asking ARTUS JOHNSON whether he had handed out a quantity of crack cocaine. ARTUS JOHNSON's reply, "I'm here to get two," indicated that he was at his "crib," that is, his residence, to get two unknown units of crack cocaine. JOHNSON then responded, "Man, you can leave it. I'll give it to you in a little bit," meaning that JOHNSON would provide the crack cocaine to ARTUS JOHNSON instead of ARTUS JOHNSON retrieving it from his residence. Nex, ARTUS JOHNSON asked JOHNSON whether he had a quantity of drugs when he said, "You ain't got two-

thirds?" JOHNSON responded that he did not have those drugs on him. ARTUS JOHNSON then informed JOHNSON that another party had ordered 10 units of drugs when he said, "They told me 10 at first." When JOHNSON replied, "Unless somebody went to grab it. They ain't grab me any more though." I believe that JOHNSON was informing ARTUS JOHNSON that no one had picked up the 10 units or obtained any more drugs for JOHNSON. Additionally, when JOHNSON stated, "I'm waiting for my young boys to come pay [UI] owe me," I believe JOHNSON was informing ARTUS JOHNSON that he was waiting for lower-level drug dealers, "my young boys," to pay him for the drug he supplied. Lastly, when JOHNSON stated, "I'm waiting for my shit to land as soon as they come to town and shit," I believe that JOHNSON was informing ARTUS JOHNSON that he had another drug deal planned, that is, "waiting for my shit to land," and was waiting for the other party to arrive, that is, "come to town."

13.    During the course of the court-authorized interception of JOHNSON's cellphone, which began on January 3, 2024, and is ongoing, FBI agents intercepted numerous communications that indicated EDDIE HUTCHINSON had conspired with JOHNSON to distribute controlled substances. Below are several examples of intercepted communications that demonstrate the existence of this conspiracy:

a.    On January 4, 2024, at approximately 1:50 p.m., FBI agents intercepted an incoming telephone call to JOHNSON's cellphone from EDDIE HUTCHINSON. During the conversation, HUTCHINSON stated, "Yo, two hard, two soft." Based on my training and experience, I know that "hard" is slang for

crack cocaine and "soft" is slang for powder cocaine. Thus, I believe that
HUTCHINSON was ordering two grams each of crack cocaine and powder cocaine.
HUTCHINSON also stated, "Alright. You still got the good shit? I don't want that
bullshit." Based on my training and experience, I believe that HUTCHINSON was
asking JOHNSON whether the cocaine he was supplying was high quality and
stating that he did not want poor quality cocaine. JOHNSON replied, "Yeah, I got
fire." Based on my training and experience, I know that "fire" is common slang for
high quality drugs. Therefore, I believe that JOHNSON was confirming that the
cocaine he intended to sell to HUTCHINSON were high quality.

      b.     On January 26, at approximately 1:56 p.m., FBI agents
intercepted a call to JOHNSON's cellphone HUTCHINSON. During the call,
HUTCHINSON stated, "I need 15 hard," and "How long Money? Because I got to
bust a move. I'm getting dressed now and I don't want to be waiting all day."
JOHNSON responded, "Give me like 15." Based on my training and experience and
what I have learned during this investigation, I believe that HUTCHINSON
ordered 15 grams of crack cocaine ("15 hard") from JOHNSON. Further, when
HUTCHINSON stated, "How long Money? Because I got to bust a move," he was
first asking JOHNSON how long it would take to fulfill the order or to convert
powder cocaine to crack cocaine and then explaining that he intended to sell the
crack cocaine to other persons, that is, "bust a move."

      14.     During the course of the court-authorized interception of JOHNSON's
cellphone, which began on January 3, 2024, and is ongoing, FBI agents intercepted

numerous communications that indicated JAMHAL PHILLIPS had conspired with JOHNSON to distribute controlled substances. Below are several examples of intercepted communications that demonstrate the existence of this conspiracy:

a.      On January 24, 2024, at approximately 1:28 p.m., FBI agents intercepted an outgoing telephone call from JOHNSON's cellphone to PHILLIPS. During the conversation, PHILLIPS stated, "Oh, about the gram, I still got some. I still got like 2 G's." Based on my training and experience, I believe that PHILLIPS was informing JOHNSON that he still had two grams of cocaine, which is typically sold in grams at the street level. Later in the conversation, JOHNSON stated, "You ain't make nothing happen?" and "I gave you 3 though." Based on my training and experience, I believe that JOHNSON was asking PHILLIPS why he had not yet sold the three grams of cocaine that JOHNSON had previously provided. PHILLIPS responded, "Yeah, you gave me 3. Yeah, I got, like, 2. I still, yeah, I ain't got the whole 90 though. I ain't got the whole 90 on me. Nah." Based on my training and experience, I believe that PHILLIPS was informing JOHNSON that he sold one of the three grams of cocaine, but that he did not have the full $90 that PHILLIPS owed to JOHNSON for the gram that he sold. Later in the conversation, PHILLIPS stated, "Alright, well I got these 2 G's on me. I got 30 on me. You feel me?" Near the end of the conversation, JOHNSON stated, "I might need to see you real quick, on like a demo note." PHILLIPS replied, "Yeah, pull up." Based on my training and experience, I believe this exchange indicated that JOHNSON would soon visit PHILLIPS to further discuss their drug trafficking activity.

b.    On February 2, 2024, at approximately 11:15 a.m., FBI agents intercepted a telephone call from JOHNSON's cellphone to PHILLIPS. The call was transcribed as follows:

JP: Hello.

MJ: Ayo.

JP: Yo.

MJ: When you bringing that circle out, yo?

JP: Give me 5-10 minutes.

MJ: Hunh?

JP: Give me 5-10 minutes.

MJ: Hunh?

JP: I said give me 5-10 minutes.

MJ: 5-10 minutes?

JP: Yeah.

MJ: I said I'm out here right now.

JP: Alright, here I come.

MJ: I got [UI] to get in Bordentown.

JP: Alright here I come.

MJ: Get rid of that shit. I don't know what you do, bitch.

JP: I'm going to come out there.

MJ: I fuck around [UI] bitch.

MJ: I'm going to pull up in like 2 minutes.

JP: Alright.

Based on my training and experience and what I have learned from this investigation, I believe that this conversation was about an ounce of cocaine. I know from my training and experience that "circle" is common slang for an ounce of cocaine. Thus, when JOHNSON asked, "[w]hen you bringing that circle out," he was asking PHILLIPS when he would be bringing it out to him. JOHNSON and PHILLIPS then bickered about how quickly PHILLIPS would bring the ounce of cocaine outside to JOHNSON, with JOHNSON concluding the call by stating he would arrive in about two minutes.